MR. JUSTICE SHEEHY,
dissenting:
I dissent and would affirm the decision of the District Court granting summary judgment in favor of Barney Reagan.
The majority opinion shows a startling indifference to, or lack of knowledge of, the operation and effect of division orders on their underlying instruments in the oil and gas *10 production business.
The production of oil and natural gas in Montana, at the time of this case, is subject to the following taxes:
1. Oil and Gas Conservation Tax, Section 82-11-131, MCA. Under this tax provision, the producer pays the tax for oil or gas “produced for himself, as well as for another, including a royalty owner. ...”
2. An Oil and Gas Severance Tax, Section 15-36-101, MCA. Here the producers are required to pay this tax in full for their own account and for the account of each other owner
“of the gross proceeds in value or in kind of all the marketable . . .oil or natural gas extracted and produced, including owner or owners of working interest, royalty interest, overriding royalty interest, carried working interest, net proceeds interest, production payments, and all other interest or interests owned or carved out of the total gross proceeds in value or in kind”
of such production. Section 15-36-101(3), MCA. That statute also provides “[ujnless otherwise provided in a contract or lease, the pro rata share of any royalty owner or owners will be deducted from any settlements under said lease or leases or division of proceeds orders or other contracts.” (Emphasis supplied).
3. A Resource Indemnity Trust Tax, Section 15-38-104, MCA. This tax is laid on any person engaged in the business of mining, extracting or producing minerals in Montana. The statute provides further “[ujnless otherwise provided in a contract or lease, the pro rata share of any royalty owner or owners may be deducted from any settlements under the lease or leases or division of proceeds orders or other contracts.” (Emphasis supplied).
4. An Oil and Gas Net Proceeds Tax, Section 15-23-607, MCA. This tax includes an assessment of royalties paid to a royalty owner (Section 15-23-605), and is payable by the operator or producer who may deduct from the royalty owner an estimated amount of the tax to be paid by him *11 upon the royalty or royalty interest.
5. A Windfall Profits Tax, levied by the Federal government under Section 26 U.S.C. Section 4986, et seq. The windfall profits tax is laid on the producer of taxable crude oil and gas, and the producer is defined as the “holder of the economic interest with respect to the crude oil.” 26 U.S.C. Section 4996(a)(1)(A). Internal Revenue regulations provide that a producer is the “holder of the economic interest with respect to the crude oil in the ground.” IRS reg. 51. 4996-l(b)(l) (Emphasis supplied).
I have stated those tax provisions at length to demonstrate to the reader that the various state taxes are laid upon the producers and the royalty owners of the oil and gas, and in the federal case, upon the owner of the crude oil in place in the ground.
At issue in this case then is who is the owner of the oil and gas rights here in question, the Montana Power Co. and Union Oil Co. on the one hand or Barney Reagan on the other, as one of the Reagan Associates.
Clearly in this case, Montana Power Co. and Union Oil Co. are the owners of the working interest, subject only to the royalty payments to the land owners (in this case, the tribes). Clearly in this case, Barney Reagan, and the Reagan Associates, have no ownership in the oil and natural gas either produced and saved, or in place in the ground.
It should further be clear that the precise issue in this case is not the payment of the oil and gas taxes. Those taxes have been paid, and will in the future continue to be paid. The point at issue in this case is whether Montana Power Co. and Union Oil Co. can deduct from Barney Reagan’s rightful payments here the amounts of those oil and gas taxes.
Prior to October 18, 1954, the Reagan Associates under a contract with Union Oil were entitled to 20% of the net profits derived from production of oil and gas under certain leases on tribal lands, from all formations down to and including the Madison formation, and 15% of the net profits *12 derived from production from all formations under the Madison formation. On October 18, 1954, by written agreement, the Reagan Associates converted the 20%-15% net profits interest in production from said oil and gas leases to a general obligation and liability of Union Oil Co. and Montana Power Co. based upon 5% of the value of the oil and gas produced from the leased tribal lands.
On October 18,1954, the Reagan Associates was a group of persons and entities which included Ed Reagan, the father of the plaintiff here, the then governor of Montana, J. Hugo Aronson, J.E. Corette, Jr., either the attorney for or president of the Montana Power Co. at the time, and numerous officers or attorneys of the Montana Power Co., and members of their families.
The underlying leases in which the Reagan Associates had a 20%-15% net profits interest each contained the following language:
“The leasee hereby agrees that he will not assign or sublet any part of the lands herein leased without the written consent of the lessor and the approval of the Secretary of the Interior. The assignment of this lease or any interest therein without such written consent and approval shall constitute a violation of one of the material and substantial terms and conditions of this lease and be cause of cancellation thereof.”
It is therefore clear that if the written agreement of October 18, 1954 converted the 20%-15% net profits interest of the Reagan Associates into an overriding royalty interest, then the agreement should necessarily be submitted to the tribe (the lessor) and the Secretary of the Interior for approval. The attorneys representing Union Oil Co., and the Montana Power Co., and the members of the Reagan Associates themselves recognized that in 1954 such a conversion to an overriding royalty interest would not be approved either by the tribe or by the Secretary of the Interior, but particularly by the latter. The clear intent of the parties was to devise an instrument that did not constitute a trans *13 fer of ownership that must be approved by the Secretary of the Interior, but rather to find a way to create a general obligation of Union Oil Co. and Montana Power Co. which would not have to be submitted to the Secretary of the Interior for approval.
Discovery procedures conducted before the District Court here, have yielded letters which shed much light on the intention of the parties with respect to the problem of the agreement. On January 28, 1954, Mr. L. V. Ketter, a Butte attorney, wrote to Mr. J. E. Corette, at the Montana Power Co., a letter reporting on a meeting of January 22, 1954, in Great Palls, “concerning the conversion of the net profits interest of the Reagan Associates in the production from the Union lands to 5 % overriding royalty in the production from Union and Montana lands.” In a long dissertation in the letter, Mr. Ketter outlines that an overriding royalty interest would probably be subject to the approval of the Secretary of the Interior, and that the risk involved was cancellation of the tribal leases. Mr. Ketter enclosed copies of the agreement which was executed on October 18, 1954, and stated:
“If the leases were to be canceled acquiesence for the breach of the provisions therein, or of the regulations, requiring prior approval of an assignment of any interest in them, then of course, Union and Montana would lose the respective leaseholds and the Associates would lose not only the overriding royalty but their net profits interest which the royalty interests were to supplant. If the the [sic] leases were not canceled but only the royalty assignments were voided through some action of the government, or the government and the tribe, then there would be a failure of consideration for the surrender of the net profits interest and the latter would probably be reinstated as a matter of law.”
Mr. Corette thereafter wrote a letter to Mr. Ketter on March 30, 1954. It is not clear from the letter whether Mr. Corette was wearing the chapeau of J.E. Corette, Jr. one of the Reagan Associates, or the sombrero of an officer or at *14 torney of the Montana Power Co. At any rate however, he said:
“Union, from its contacts with the Department of the Interior, is satisfied that the Department will not approve any overriding royalty on Indian leases, but will approve net proceeds arrangements comparable to the former arrangement with Reagan Associates. Bert [refers to Bert Gibbons, then general counsel of Union Oil Co.] suggests that we consider the following alternatives:
“1st. Execute the agreement and send it to Reagan Associates with a letter stating that we are not getting approval and that therefore they have no interest in the leases and only the obligation of Montana and Union to pay 5% of the gross income. Under this procedure the question arises as to whether this might be considered a transfer of an interest in the leases which could be used as a basis by the Government for claiming forfeiture of the leases; or “2nd. Get approval of the Department. Bert thinks there is no possibility of doing this.
“Bert believes that if we follow Plan No. 1 and if that is agreeable to the Reagan Associates there is probably no great risk from a practical stand-point; that his information from Frary and others is that this is not an unusual procedure.
“Union is willing to go along with Plan No. 1, set forth above, without any approval by the Tribal Counsil [sic] or the Department of the Interior.” (Emphasis supplied).
Thereafter, the agreement of October 18, 1954, was executed by the Reagan Associates, acting through attorneys in fact, the Union Oil Co. and the Montana Power Co. Under the written agreement, the Reagan Associates released and quit-claimed forever their interest in the net proceeds [profits] in the leases, and accepted instead “a general obligation and liability of Union and Montana” measured by an amount equal to 5% of the value of the oil produced and saved from the Union and Montana lands. The general obligation and liability continues in force as long as the oil and *15 gas leases remain in effect. The agreement further provided that the Reagan Associates would divide the 5% general obligation and liability among themselves in proportion to their ownership of the 20% net profits interest.
When District Judge Frank E. Blair granted a summary judgment in favor of Barney Reagan in this case, he did so on the ground that no material issue of fact existed, and that “as a matter of law the written contract of the parties of October 18, 1954, created a general obligation and liability of Union Oil and Montana Power and not any economic interest with respect to the oil or gas in place in the ground. This is fatal to Defendants’ contentions.”
District Judge Frank E. Blair was indubitably correct. His finding is absolutely in accord with the terms of the agreement of October 18, 1954, all of which provide that it is a general obligation and liability of the two companies, and which provisions include a release and quitclaim forever the net profits interest of the Reagan Associates. The reasons for the agreement are clear from the communications between the Montana Power Co., its attorneys, and representatives. By creating a general obligation and liability instead of an overriding royalty interest in the leased lands, the parties avoided the necessity of submitting the agreement for approval to the tribe and to the Secretary of the Interior.
There is no ambiguity in the agreement of October 18, 1954. The intent of the parties is clear that a general obligation and liability against Montana Power Co. and Union Oil Co. was created. The Reagan Associates under the agreement stand in the position of general creditors of the corporations. Because of their release and quit-claim, they are not the owners of any economic interest, overriding royalty interest or other interest in the oil and gas in place, or produced and saved from the tribal lands leased.
Defendants, Montana Power Co. and Union Oil Co. however, have managed to obfuscate the clear issue for the majority of this Court, by raising the specter of the division *16 orders signed by Barney Reagan. I use the term “specter” here because those persons who have observed such beings report that they are so ethereal that they are easily seen through.
Barney Reagan, the plaintiff here, is the son of Ed Reagan, one of the attorneys-in-fact who executed the instrument here, and of course, one of the Reagan Associates. Barney Reagan succeeded to the interest of Ed Reagan in 1969. In March of 1970, he signed division orders for the Union Oil Co. relating to the division of interest to which he was entitled, 16.66% of 5% of the whole interest. It is the contention of the defendants that the language of the division orders show that Barney Reagan is an overriding royalty interest owner, and not a general creditor of the companies involved.
Each of the division orders, submitted by Union Oil to Barney Reagan, contained the language that the signer certifies and warrants that he is “the legal owner in the proportions set out below of all the oil, and in the proceeds from casinghead gas produced from Union’s lease” on the tribal lands. The division order has other printed language on it which is material. It provides that the oil received under the division order shall be paid for by the purchaser (in this case Union) in accordance with the division of interest shown on the face of the division order; the division order is revocable by either party upon thirty days notice; revocation by Barney Reagan, however, would not constitute revocation by any other of the Reagan Associates.
The majority are completely in error that the language of the division order can be used to supplement the terms of the 1954 agreement or to constitute a representation of ownership of the oil and gas by Reagan.
First, under the agreement of October 18, 1954, the Reagan Associates forever release and quit-claimed their net profits interest in the oil and gas leases. No matter what Barney Reagan warranted or represented in the division order, he cannot become an owner of an overriding royalty *17 interest in those leases unless there is an instrument deeding back to him from Union and Montana Power Co. such an interest. None appears here.
Secondly, the majority miss or confuse the purpose of a division order.
“A division order is an instrument prepared by the purchaser of oil and gas which directs to whom and in what proportion the purchase price is to be paid. Primarily, it is for the protection of the purchaser of the oil...” Sullivan, Handbook of Oil and Gas Law (1955), p. 140.
And Sullivan further states:
“. . . A division order is separate and distinct from a conveyance of unaccrued royalty. It merely directs to whom payments should be made for oil that has already been produced. A division order does not supersede the lease by operating as a novation as to the royalty.” Sullivan, supra, pp. 141-142.
(Sullivan, it should be noted, served for many years as Dean of the Law School at the University of Montana. He then became Vice-President and General Counsel of Montana Power Co. He did not participate in this case.)
Sullivan is of course in accord with the law on the purpose and effect of division orders. Such instruments determine who is entitled to payment for the sale and purchase of oil and gas, and in what proportions. As stated in Phillips Petroleum Co. v. Williams (5th Cir. 1946) 158 P.2d 723, 727:
“As to contention one, the division and transfer orders, with their definite declaration that the market value of the gas at the mount of the well is to be the measure of lessors’ rights and lessee’s obligations, and their clear and full provision for precisely arriving at the value, we agree with defendant, that, until withdrawn or modified, they constitute the precise and definite basis for payments, and payments made in accordance with them are final and binding. The very existence of this and the numerous other litigations which have arisen over the meaning and effect of market price or rate provisions and over what was the market price *18 or value of the gas, and the fact that these agreements fix, as due, sums which may from time to time be more or less than the prevailing market price, give full support to and make binding payments and settlements made thereunder. Binding as they are, however, in respect of payments made and accepted under them, these divisions or transfer orders did not rewrite or supplant the lease contract. They are binding only for the time and to the extent that they have been, or are being acted on and made the basis of settlements and payments ...”
In Maddox v. Gulf Oil Corp. (Kansas 1977), 222 Kan. 733, 567 P.2d 1326, 1328 it is said:
“. . . The insertion in the division orders of matters contrary to the oil and gas leases, or contrary to the law, cannot be unilaterally imposed upon the lessor by the lessee or the purchaser. Here the unilateral attempt by Gulf in the division orders to amend the oil and gas leases, and thereby deprive the royalty owners of interest to which they were otherwise entitled, was without consideration. Therefore, the provisions of the division order regarding waiver of interest are null and void as determined by the trial court.” It is therefore clear from the cases the division orders signed by Barney Reagan could have no legal effect on his rights under the agreement of October 18, 1954. Therefore no material issue of fact exists with respect to those division orders. Judge Blair’s summary judgment ought to be affirmed in toto.
MR. JUSTICES SHEA and MORRISON join in the dissent of MR. JUSTICE SHEEHY.